## BALTIMORE BEDDING CORPORATION *v.* DANIEL J. MOSES ET AL.

[No. 18, October Term, 1943.]

230

*Decided November 4, 1943.*

The cause was argued before SLOAN, C. J., DELA-PLAINE, COLLINS, MARBURY, GRASON, MELVIN, ADAMS, and BAILEY, JJ.

*Abram C. Joseph*, with whom was *Daniel C. Joseph* and *Samuel J. Freedman* on the brief, for the appellant.

*Leonard Weinberg* and *George L. Clarke*, with whom were *Weinberg & Green* on the brief, for the appellees.

MELVIN, J., delivered the opinion of the Court.

The bill of complaint in this case was filed by the appellees, Daniel J. Moses and Raymond W. Taylor, co-partners, trading as Baltimore Spring Bed Company, against Baltimore Bedding Corporation, appellant, charging the latter with unfair competition in the use of its corporate name, and seeking an injunction against such use. The defendant answered the bill in due course and after a hearing in open court, the chancellor granted the prayer of the bill and issued an injunction in these words: "That a writ of injunction be issued from this Court perpetually enjoining and restraining the Defendant, Baltimore Bedding Corporation, its agents, servants and employees, from the use by the said Defendant of the name 'Baltimore Bedding Corporation' in connection with the advertising for sale of mattresses or other bedding materials, or for renovating the same, or in soliciting or obtaining orders for sale or renovation of such mattresses or bedding materials on price lists or form orders, or other printed or written matter, except in such manner as to prevent the public from believing that the goods and services of the defendant are those of Daniel J. Moses and Raymond W. Taylor, co-partners trading as Baltimore Spring Bed Company. And such form of disclaimer as may be adopted by said defendant in compliance with this decree is hereby required to show clearly and amply the said absence of connection with complainants and their business." It is from this decree that the present appeal is taken.

The essential facts of the case are practically unquestioned. Appellees are co-partners, trading as Baltimore Spring Bed Company, with their principal office in Baltimore City, and for over twenty-five years have been engaged in the bedding business under that trade-name. Their products are sold at wholesale to jobbers and retailers, principally throughout Maryland and adjacent territory, orders being received from their salesmen as well as by mail and telephone.

According to both parties to the case, the term "bedding" is that generally used in the trade and covers "practically everything," that is to say, mattresses, springs, cots, couches, quilts, cushions, and also the bed itself. Besides manufacturing and selling these products, the appellees' business includes repairing and renovating them for their customers, and also, to a minor degree, in acting as distributor for bedding goods of other manufacturers, not located in Baltimore. All, however, are advertised as coming from one commercial source—the appellees.

Since the beginning of their operations over twenty-five years ago, appellees have extensively publicized their trade-name, "Baltimore Spring Bed Company," built up a large patronage thereunder, and have established good will and a reputation for fair dealing and excellence of products. The present worth of the firm is $200,000, and for the year 1941 it did a business of "close to $400,000."

Appellant was incorporated under the laws of Maryland in February, 1942, with its principal office in Baltimore City, and with the name of Ralph Pheterson being given as the resident agent. The business of the corporation was to be that of manufacturing, renovating and selling mattresses and bedding in Baltimore City and elsewhere. According to Pheterson, the corporation was originally set up to do a wholesale business. His associates at first, he testified, were Leonard L. Eisenberg, who represented himself to Pheterson to be a lawyer, and one Moe Snyder, both of whom were employees of

the Comfort Spring Company, located in Baltimore. Eisenberg was a salesman or foreman for that company, and, inferentially from the testimony, was familiar with the names and standing of those already engaged in the bedding business in Baltimore. The only money that was put in the business to start with was about $2,300, of which Eisenberg put up about $2,000, and Snyder $300. Pheterson put in no money but contributed "services and knowledge and machinery." Eisenberg was made president and Pheterson became "production manager."

After the incorporation on February 2, 1942, operations were held up by the Maryland State Health Department "for some time," during which interval appellees, through their counsel, wrote a letter to appellant under date of February 19, 1942, stating: "We have noted the recent incorporation of the Baltimore Bedding Corporation, and it is obvious that the use of this name by the corporation will result in considerable confusion with the business operated by our clients. Mr. Moses and Mr. Taylor have been conducting their business in Baltimore City for a number of years and have established a valuable trade-name in the Baltimore Spring Bed Company. We must, therefore, insist that you cease to use the name Baltimore Bedding Corporation or we shall be forced to take the necessary action to protect our clients' interests."

This letter was received by Eisenberg, who threw it in the wastebacket, according to Pheterson. When asked "how much advertising had you done up to that time" (the receipt of the letter), Pheterson's reply was "I wouldn't know." Continuing the testimony:

"Q. You wouldn't know? A. No, sir, it wasn't in my part.

"Q. Had it done $50 of advertising? A. I wouldn't know.

"Q. It had not done any business up to that time, had it? A. I wouldn't know.

"Q. Didn't you just tell his Honor that for the first few weeks you didn't do any business because the Health Department wouldn't let you? A. Yes. But you know all that. Why ask it again, I wonder?

"Q. Having got that notice and request from us, what did you do about it? A. You heard that, too.

"Q. You did nothing about it, is that it? A. No, sir."

Appellees made further protests to appellant, through telephone calls and correspondence, against the adoption and use of the name "Baltimore Bedding Corporation," but the appellant persisted in its refusal to heed any of these protests and went ahead despite them.

Some time "around June or July," according to Pheterson, both Eisenberg and Snyder ceased to have any connection with the corporation, since which time the business has belonged to Pheterson "entirely." He modified this statement later by saying that:

"This isn't my own individual business. This is a corporation. It belongs to the stockholders.

"Q. Who are the stockholders? A. Myself, my son-in-law.

"Q. Who are the officers of the corporation now? A. Myself, my son-in-law, my wife and my daughter.

"Q. And they are also the stockholders? A. Yes, sir."

The record shows that Pheterson moved to Baltimore from his home town, Rochester, New York, via Norfolk, "over two years" before this suit. He was "looking for a job," he said—"and I contacted the Sanitary Mattress Company and they engaged me." He was foreman in that employ and left the company in September, 1941. About a month or so later he set up in business in Baltimore as "Acme Mattress Company" but had not gotten under way in this when he and Eisenberg and Snyder incorporated the Baltimore Bedding Corporation.

These details give a definite idea of the background of the appellant and of the man who was practically the sole operator of it, although, according to him, it was the salesman-lawyer Eisenberg who conceived the plan

of incorporating Pheterson and setting him up in that form as a dealer in bedding.

Pheterson denies that he was the one who selected the name "Baltimore Bedding Corporation." However, on cross-examination he undertook to tell the chancellor why he preferred the name in question to any other name. His answer is: "Well, from my forty years' experience, Your Honor, I have found that people like to deal with a local concern, and it is worth while to make it known that we are a local concern." That was at the beginning of the corporate life of the appellant when, Pheterson said, "we were set up to go in the wholesale business." Ever since his partners left him, he continued, he turned more to ward renovating and the business of second-hand and rebuilt mattresses. He had been in this business in Rochester under the name "Best Grade Mattress Company," and thereafter chose "Acme Mattress Company" for his next venture, and did not hit upon the name "Baltimore Bedding Corporation" until after he had gotten in touch with Eisenberg.

Since the principal acts which form the basis of this suit were directed in large part by Eisenberg and his colleague Snyder, it is significant to note that neither one of them was called as a witness in the case and no explanation given for failure to do so.

This recital of facts focuses attention, therefore, on the conduct of appellant's officers in two particulars: (1) Their persistence in the use of the name Baltimore Bedding Corporation, which was admittedly set up in the beginning for a line of business in competition with appellees, after formal protest had been made against the use of that trade-name because of the confusion likely to arise therefrom; and (2) their action in resorting to inaccurate and misleading advertisements, notably in the Baltimore Telephone Directory, under the head "Baltimore Bedding Company" "39 years experience," etc., without mention of the name of Pheterson or any other person who may have had that much experience indi-

vidually, it being a fact of record that the Baltimore Bedding Corporation had only been in existence less than one year.

The chancellor summarized his findings of fact from the case and therefrom drew the two conclusions of law upon which the decree is based: (1) That the trade-name which the appellees have used for over twenty-five years in connection with their business has acquired a secondary meaning which entitles appellees to the protection of the court in the exclusive use of that term, including particularly the geographical name "Baltimore"; and (2) that appellant's conduct in connection with the use of the name Baltimore Bedding Corporation after being warned beforehand of the claim of the appellees that confusion would probably arise, and its refusal to adopt any distinguishing features to avoid confusion, show a wrongful intent to trade on appellees' good reputation, long established.

In granting the injunction the chancellor adopted the usual procedure in such cases, where injunctive relief is sought, of giving the offending party the opportunity of disclaiming any unfair competition by adopting such form thereof as will show clearly and amply the absence of connection with appellees and their business.

In reviewing the facts and the principles of law applicable to this case, it is of first importance that the doctrine of unfair competition be examined as to the high purpose which it was intended to serve. Expressed in simple words, this was to prevent dealings based on deceit and dishonesty, and was, at first,—approximately a hundred years ago,—applied only to what were then termed "trade-mark cases." Since that time the gradual tendency of the courts has been to extend the scope of the law to all cases of unfair competition in the field of business.

This law, both in letter and spirit, is laid upon the premise that, while it encourages fair trade in every way and aims to foster, and not to hamper, competition,

no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort. This necessarily precludes the trading by one dealer upon the good name and reputation built up by another. *Two Centuries Growth of American Law,* p. 436, W. K. Townsend; *Nims on Unfair Competition and Trade Marks,* 3rd Ed., 6-15.

What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception. Wherever, in any case, these elements of fair trade are found to be lacking equity will grant protection against the offending party. *Foss v. Culbertson,* 17 Wash. 2d. 610, 623, 136 P. 2d 711, 717.

In the case at bar, the first ground advanced by appellees for relief in equity is that the word "Baltimore" has become so associated in the minds of the purchasing public with their products that this name has acquired a secondary meaning which would prohibit its use by a subsequent competitor. If sustained, this would entitle appellees to an injunction against the appellants on that ground alone, for it would amount to a kind of unfair competition which is clearly recognized in law, and forbidden.

However, we hold that this is not a case where the doctrine of secondary meaning applies. An enlightening summary of that doctrine is found in *Merriam Co. v. Saalfield,* 198 F. 369, 373, and quoted in *Nims, supra,* 107: "Primarily, it would seem that one might appropriate to himself for his goods any word or phrase that he chose; but this is not so, because the broader public right prevails, and one may not appropriate to his own exclusive use a word which already belongs to the public and so may be used by any one of the public. Hence comes the rule, first formulated in trade-mark cases, that there can be no exclusive appropriation of

geographical words or words of quality. This is because such words are, or may be, aptly descriptive, and one may properly use for his own product any descriptive words, because such words are of public or common right. It soon developed that this latter rule, literally applied in all cases, would encourage commercial fraud, and that such universal application could not be tolerated by courts of equity; hence came the 'secondary meaning' theory. There is nothing abstruse or complicated about this theory, however difficult its application may sometimes be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trademark. So it was said that the word has come to have a 'secondary meaning' * * *."

Or, as stated elsewhere in the text by this authority: "It (secondary meaning) exists only in the minds of those of the public who have seen or known or have heard of a brand of goods by some name or sign and have associated the two in their minds." *Nims, supra*, 105.

Secondary meaning, therefore, imports association in the mind of the purchasing public of a geographical name and a particular product as identifying a certain trader's goods. When appellees established their business in Baltimore some twenty-seven years ago, and not only manufactured beds, mattresses, bedding, etc., but also took on products of other manufacturers, such as Foster, Palmer and Goodyear, who were located elsewhere than in Maryland, they acquired no right to monopolize the name Baltimore as against appellant or any other later comers into this field of business who might likewise adopt that geographical name as part of their trade-mark.

The City of Baltimore is recognized as one of the great industrial and commercial centers of the world, where, among hundreds of other types of manufacturers, there are, according to the record, about a dozen engaged in the manufacture of bedding alone, some of whom have been in business longer than the appellees. It would not be reasonable to hold, therefore, that when one thinks of beds, bed springs or bedding in the Baltimore trade, one would ordinarily think of such products as being those of appellees exclusively. *Weiskittel & Sons Company v. J. Harry C. Weiskittel Company,* 167 Md. 306, 173 A. 48; *Neubert v. Neubert,* 163 Md. 172, 161 A. 16; *Drive It Yourself Co. v. North,* 148 Md. 609, 130 A. 57, 43 A. L. R. 206; *Columbia Mill Co. v. Alcorn,* 150 U. S. 460-466, 37 L. Ed. 1144.

If the application of the secondary meaning doctrine, therefore, were the only ground upon which unfair competition is charged against appellant, relief would have to be denied in this case.

Coming to the second ground upon which injunctive relief is sought, the case takes on a different aspect, for the conduct of appellant in relation to the respective trade-names of the parties clearly indicates unfair competition.

The doctrine of unfair competition is based on the principle of common business integrity, and the power of a court of equity to uphold this principle has been extended to prevent deception of the general public through the employment of methods which are not on that basis. *Eastern Outfitting Co. v. Manheim,* 59 Wash. 428, 110 P. 23; 35 L. R. A., N. S., 251.

As expressed in *Dodge Bros. v. East,* D. C., 8 F. 2d 872, 875: "Equity looks, not at the character of the business in which the parties before the court are engaged, but at the honesty or dishonesty of their acts." Also, in the language of Justice White in the Singer Sewing Machine Company case [*Singer Mfg. Co. v. June Mfg. Co.*], 163 U. S. 169, 16 S. St. 1002, 1009, 41 L. Ed. 118, while

the use of a particular name by a party was sanctioned, "he cannot resort to any artifice, or do any act calculated to mislead the public as to the identity of the business, firm or establishment, or of the articles produced by them, and thus produce injury to the other beyond that which results from the similarity of name." *Weiskittel Co. v. Weiskittel Co., supra; Howe Scale Co. v. Wyckoff, Seamans & Benedict*, 198 U. S. 118, 25 S. Ct. 609, 49 L. Ed. 972; *Bagby & Rivers Co. v. Rivers*, 87 Md. 400, 40 A. 71; *Herring-Hall-Marvin Safe Co. v. Hall's Safe Co.*, 208 U. S. 554, 28 S. Ct. 350, 351, 52 L. Ed. 616; *Elgin Butter Co. v. Sands*, 155 Ill. 127, 40 N. E. 616.

Applying this test to the case at bar, and considering the undisputed facts, appellant's defense to the action fails. The conception of the idea of a corporation having the particular name that was adopted; the circumstances under which it was formed and originally set up for competing in the wholesale "bedding" business; the background and personnel of those who originated the enterprise; the advertising in the Baltimore Telephone Directory and otherwise that this new concern, Baltimore Bedding Corporation, had "39 years experience," whereas it had been in existence less than one year; the persistent refusal to modify in any way this new trade-name, after timely protest, or to make any disclaimer; the withdrawal from the corporation within four months of its formation of two of the three incorporators, Eisenberg and Snyder, and the failure to produce, without explanation, either one of them as a witness in this case, all combine to create an atmosphere of bad faith and unfair competition.

In the absence of his co-founders of this enterprise, the only one who could have cleared this atmosphere was Pheterson, himself, and he was the only one offered for that purpose. That he has not only failed to do so by both the manner and substance of his testimony but, on the contrary, has further clouded the atmosphere of the case, is beyond question.

His attempts at explaining the reason for adopting the particular name, Baltimore Bedding Corporation, are not convincing and have practically no probative value, inasmuch as he testified that either Eisenberg or Snyder, made that selection and not he, Pheterson. His own theory about it—"that people like to deal with a local concern" with a local name—is not even plausible, for the reason that none of his previous ventures had had geographical names, but had been such as "Best Grade Mattress Company" when he was in Rochester, and "Acme Mattress Company" when he first planned to do business in Baltimore. The master-mind in the corporation, Eisenberg, lawyer and business man, who knew the bedding field locally, is left exposed as the one most likely to have chosen the name now in controversy, and to have done so for reasons that do not commend themselves to a court of equity under the circumstances.

If there were no other circumstance involved here than the use of the words "39 years experience," under the name Baltimore Bedding Corporation in appellant's advertising, a case of unfair competition would be made out on that point alone. It gives flavor and color to appellant's whole project and cannot be disassociated from it by anything appearing in the record, or by explanation of counsel. In the words of *Nims, supra*, p. 1003: "Fraudulent matter in any considerable part of the advertising media tinges the whole with that fraud upon which equity looks with disfavor."

It is argued that Pheterson, who solely controlled and operated the appellant corporation after Eisenberg and Snyder had withdrawn from it, had had thirty-nine years experience in the bedding business, but Pheterson's name is not even mentioned in the advertisements in question. So far as prospective customers were concerned, they were told, in effect, that this corporation had been established in its business for thirty-nine years, and not simply that one individual connected with it may have had thirty-nine years experience as a craftsman.

To deal with an old established house, which had built up a good reputation over a period of nearly forty years as the advertising in question implied, is quite different from dealing with an entirely new corporation which had not had time to build up any kind of a reputation, good or bad, and which was actually being operated by an individual who had only resided in Baltimore City for a comparatively short time. Yet, that is precisely the impression which this branch of its advertising by appellant was calculated to give, and is based on a statement which is both inaccurate and misleading.

"False and misleading advertising is a dishonest practice, and amounts to unfair competition" which will not be countenanced by the courts. *Federal Trade Commission v. Balme,* 23 F. 2d 615, 621; *In re Northern Pigment Co.,* 71 F. 2d 447; *Wawak Co. v. Kaiser,* C. C. A. (Ill.), 90 F. 2d 694.

The trend of modern decisions and of all legal authorities is more and more to a rigid adherence to the policy of protecting achievements in business built upon the foundation of diligence, integrity and fair dealing. "Caveat Emptor" no longer applies in the field of competitive business, but the buyer has the right to expect and demand that a dealer offering and advertising his merchandise, be candid, honest and truthful about it. Artifice, trickery, deception and all unfair and fraudulent methods, no matter what form these may take, are no longer countenanced by the courts.

The broad general rule which has been developed from the era of the technical trade-mark cases to present-day operations of traders and dealers in the business world, finds direct application to those phases of unfair competition which control the decision in the case at bar.

Here there is not only direct evidence of false and misleading advertisements, but there is evidence of bad faith in other particulars, notably in persisting in the use of the corporate name without modification of any kind, when, before it started operations, it had been given rea-

son to believe through timely protest that its continued use of the name would probably create confusion amounting to unfair competition. This conduct in the respects noted clearly indicated wrongful intent.

As stated in *Nims, supra,* 906, and citing *Holland Furnace Co. v. New Holland Machine Co.,* D. C., 24 F. 2d 751, 755; "Where the name of a corporation is liable to cause confusion 'the unnecessary repetition and featuring of its corporate name in its newspaper advertisements,' together with the adoption of methods similar to those of its competitior, and other unfair acts, were evidence of wrongful intent." *A G. Spaulding & Bros. v. A. W. Gamage, Ltd.,* 32 R. P. C. 273, H. L. 1915; *Marshall Ventilated Mattress Co. v. D'Arcy Spring Co.,* 280 F. 945; *National Telephone Directory Co. v. Dawson Mfg. Co.,* 214 Mo. App. 683, 263 S. W. 483; *Masson Seeley & Co., Ltd. v. Embosotype Mfg. Co.,* 41 R. P. C. 160; *Cheney Bros. v. Gimbel Bros.,* D. C. N. Y., 280 F. 746; *Nims, supra,* 800; *Bickmore Gall Cure Co. v. Karns,* 134 F. 833.

The law applicable here is aptly expressed in the case of *Elgin Butter Co. v. Sands, supra* [155 Ill. 127, 40 N. E. 618], as follows: "Even if the corporate names of the two corporations are somewhat similar, yet, in the absense of any intent, act, or artifice to mislead dealers in the market or the public at large as to the identity of the corporations, the [one company] has the same right to use its name in the transaction of its business as the [other] has to use its corporate name." The words of special significance here are "in the absence of any intent, act, or artifice to mislead." In the case at bar there is not only no absence of these elements but they are conspicuously present.

It is to be noted, also, that in the telephone directory appellant's chosen name is such that it is placed directly above that of appellees under the heading of "Bedding— Manufacturing," and in its display advertisements the word "Baltimore" in appellant's name is in the same

script form of type as that customarily used by appellees for many years. As herein elsewhere noted, appellant has added to its display advertisement the words "39 years experience." These circumstances justify the inference that the choice of names and the method of advertising were intended to trade on the name and reputation of appellees through the confusion that would be the natural consequence of such conduct.

The language of the court in the case of *McFell Electric & Telephone Co. v. McFell Electric Co.*, 110 Ill. App. 182, is directly applicable. In that case, the appellant company was organized some years after appellees and took offices in the same building, and put its sign on the bulletin board of the building directly above that of the old company, so as to give the impression that they were one and the same company. The court held: "This is not open and honest competition. It has every appearance of an attempt to mislead the public and to obtain by deception the benefit of the patronage and clientage enjoyed by appellee. Courts of equity give relief against such violations of the rules of honesty and fair dealing."

On the issue of confusion, it is not necessary that there be evidence of actual confusion in order to constitute unfair competition, but evidence only that the similarity of names and the method of operations thereunder, are sufficient to prove liability to deception. "To constitute unfair competition, defendant's conduct need not have actually deceived anyone into purchasing his goods in the belief that they were goods of plaintiff, but it is sufficient that such deception will be the natural and probable result of defendant's acts." *Hartzler v. Goshen Churn & Ladder Co.*, 55 Ind. App. 455, 104 N. E. 34; *Gotham Silk Hosiery Co. v. Reingold*, 223 App. Div. 260, 228 N. Y. S. 9; *Notaseme Hosiery Co. v. Straus*, 201 F. 99, C. C. A. (N. Y.); *Rice & Hutchins, Inc. v. Vera Shoe Co.*, 290 F. 124, C. C. A. (N. Y.); *Afro-American Order of Owls v. Talbot*, 123 Md. 465, 91 A. 570; *Blair's Foodland v. Shuman's Foodland, Inc.*, 311 Mass. 172, 40 N. E. 2d 303; *Nims, supra*, 863.

In the case at bar, one of the findings of fact by the chancellor was: "Instances of actual confusion were shown in the testimony and, while few in number up to the present time, tend to show that confusion is the natural consequence of the similarity of the two names." When to this finding is brought the support of evidence of some of the business methods employed by appellant in relation to these trade-names, the court sees no reason to disturb the general conclusion reached by the chancellor.

The acts and conduct of appellant, as above particularized, clearly show unfair competition, as that phrase is defined by all of the authorities, so that appellees are entitled to the protection of the court against it. *Hugo Stein Cloak Co. v. S. B. Stein & Son, Inc.*, 58 Ohio App. 377, 16 N. E. 2d 609.

However, it is to be borne in mind that, while the law will not countenance any conduct or methods which amount to unfair competition, it operates only against competition and trading that have that characteristic. Freedom of trade and fair competition are encouraged by the law in every way, and therefore appellant's use of its corporate name should be prohibited only to the extent that it would trespass upon the good name and reputation of appellees, as built up in this particular field of business over a long period of time. *Singer Mfg. Co. v. June Mfg. Co., supra; Howe Scale Co. v. Wyckoff, Seamans & Benedict, supra; Weiskittel Company v. Weiskittel Company, supra.*

This protection of the law to which the appellees are entitled is afforded in a reasonable manner through that portion of the chancellor's decree which prescribes, in effect, that the appellant may continue in the use of its corporate name provided, and on condition, that it adopt such form of disclaimer as will show clearly and amply absence of connection with the appellees and their business. A compliance with this decree would do substantial equity between the parties and would uphold the

principles of fair trade to which the present policy of the law is strongly committed.

As the above elements of unfair competition are conclusive of the decision in this case, it is not necessary to pass upon any of the other points raised, for they would have no controlling bearing upon it.

For the reasons above stated, the granting of the injunction, with the condition attached, will be affirmed.

*Decree affirmed, with costs to appellees.*