732 A.2d 980

**The ELECTRONICS STORE, INC.**

**v.**

**CELLCO PARTNERSHIP, et al.**

**No. 1576, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

July 7, 1999.

386

388

David Albright (Albright, Brown & Goertemiller, LLC, on the brief), Baltimore, for Appellant.

Kathryn D. Kirmayer (Kent E. Lewis, Crowell & Moring, LLP, Washington, DC, George R. Sparling and Kenney, La-

cer, Sparling, Densford & Reynolds, Lexington Park, on the brief), for Appellees, Cellco and Bell Atlantic.

Joann M. Wood (Bryan T. Dugan and Dugan & McKissick, LLC, on the brief), Lexington Park, for Appellees, Cedar Point, et al.

Argued before THIEME, BYRNES and ADKINS, JJ.

ADKINS, Judge.

This is an appeal from the granting of a motion for summary judgment in the Circuit Court for St. Mary's County in favor of Cellco Partnership and Bell Atlantic NYNEX Mobile (collectively, Bell Atlantic), appellees, and Cedar Point Federal Credit Union and Cedar Point Financial Services, Inc. (collectively, Cedar Point), co-appellees, against The Electronics Store, Inc. (Electronics), appellant. Appellant timely noted this appeal.

Appellant asks us to determine whether: 1) the plain meaning of the parties' agreement justifies a judgment for Bell Atlantic on appellant's claim for breach of contract; 2) the agreement is ambiguous and requires parol evidence to explain its terms; and 3) there are factual issues that preclude the entry of summary judgment.

For the reasons that follow, we affirm in part and reverse in part, and remand the case to the circuit court for further proceedings consistent with this opinion.

## FACTS

In the late 1980s, Electronics was interested in expanding its business, which sold consumer electronic products and offered an electronic repair service, to include sales of cellular telephones and service. At that time, the cellular telephone market was beginning to develop, and Electronics wished to provide consumers in the Southern Maryland area with cellular products. In pursuit of this interest, Electronics and Bell Atlantic entered into an agreement on July 2, 1990, to market Bell Atlantic's cellular service.

The agreement was a retail agency agreement in which Electronics could sell only Bell Atlantic's cellular service, but not related products. Electronics leased space, advertised, and opened a retail store to coincide with the "light-off" of the first cellular tower in St. Mary's County. Shortly after the opening of its store, Electronics became an authorized Bell Atlantic non-exclusive sales agent pursuant to an agency contract entered into on August 1, 1991 (the Agreement).[1] Thereafter, Electronics was able to sell Bell Atlantic products, in addition to its cellular service, in a defined geographic area on a non-exclusive basis.

In the Agreement, Electronics was limited to selling only Bell Atlantic services and could not offer any competitive services. In addition, Electronics was not able to solicit purchasers and subscribers who were already receiving Bell Atlantic's services through either Bell Atlantic itself or another retailer. The Agreement provided, *inter alia,* that Electronics could draw potential subscribers "from all classes of potential users...." It further provided: "Bell Atlantic reserves the right to market [cellular service] through its own direct sales organization, or other Agents, resellers, or otherwise, in the Area." The Agreement, as amended, stated: "Nothing herein shall restrict or prohibit Bell Atlantic from, in its sole discretion, offering potential Subscribers in the Area, through its direct sales force or otherwise, volume discounts, promotional offers, new or modified price plans or any other special offers of [cellular service]." In other words, Bell Atlantic's in-house sales department was not restricted by the contract from marketing its service in the same area in which Electronics was authorized to market Bell Atlantic's services.

As compensation under the Agreement, Electronics received a commission for any subscriber "obtained by [Electronics] and accepted by Bell Atlantic" upon the activation of service to that subscriber by Bell Atlantic. A subscriber was defined as

---

1. An amendment, dated October 1, 1992, is also part of the Agreement.

the "ultimate user of [cellular service] provided by or through Bell Atlantic."

By 1994, Electronics had successfully developed a loyal customer base. There was a steady increase in subscriber activations from 1991 to 1994, and Electronics received an achievement award from Bell Atlantic for outstanding sales. An increase in sales was also realized by the in-house direct sales force of Bell Atlantic. A portion of these sales from the in-house sales department caused this lawsuit.

Appellant's complaints primarily surround the enrollment of Cedar Point members by the Bell Atlantic in-house direct sales force. In February 1993, Betty Koehl, then CEO of Cedar Point Federal Credit Union, purchased a cellular telephone for business use from Electronics. She also enrolled in an individual program. According to appellant, in late 1994, a member of Cedar Point's Board of Directors telephoned Electronics and inquired about a discounted pricing program for Cedar Point. Electronics called upon its contact person at Bell Atlantic to begin the process of enrolling Cedar Point members. The process for enrolling a subscriber is set forth in the Agreement as follows:

Agent shall solicit Subscribers by using Bell Atlantic's [cellular service] agreements and forms (the 'Service Forms'), and shall comply with all Bell Atlantic procedures and practices for solicitation of, presentations to, and enrollment of, Subscribers.

* * *

Agent shall forward Service Forms, together with all security deposits within 24 hours of receipt of an executed Service Form.

* * *

Notwithstanding the foregoing, if Agent fails to forward Service Forms within seven (7) days of its receipt, Agent shall not be entitled to a Commission for such Subscriber.

\* \* \*

No contract between Bell Atlantic and a Subscriber shall exist until the Service Form is accepted and approved by Bell Atlantic.

Prior to forwarding the Service Forms, Electronics was informed by Bell Atlantic that the proposed major pricing plan for Cedar Point was denied because Cedar Point was a credit union.

Shortly thereafter,[2] a member of Bell Atlantic's in-house sales staff contacted the CEO of Cedar Point and successfully negotiated a pricing plan. After approval by Cedar Point's Board of Directors, Bell Atlantic and Cedar Point entered an agreement in February 1995 for cellular telephone service to Cedar Point at a discounted price. This occurred within months after Electronics requested Bell Atlantic to quote a discounted pricing plan for Cedar Point.

Subsequently, Electronics requested permission from Bell Atlantic to directly enroll Cedar Point members who "walked-in" to the store in the major pricing program. Bell Atlantic deferred to the CEO of Cedar Point who authorized Electronics to enroll "walk-in" customers in the program under the condition that: "The customers have to be credit union members in good credit standing and be approved by me. The Electronics Store can not advertise this program in any way." Additionally, Cedar Point reserved the right to cancel the agreement with Electronics. Less than three months after the agreement between Electronics and Cedar Point to allow Electronics to enroll "walk-in" customers on behalf of Bell Atlantic, Cedar Point canceled the agreement because of alleged violations by Electronics.

---

**2.** Bell Atlantic's refusal to quote Electronics a discounted price for Cedar Point occurred in "late '94" according to Paula Roark, President of Electronics. John Roark, also of Electronics, characterized it as "fall/winter time frame...." A written proposal from Tim Guy, Bell Atlantic's direct sales representative, to Cedar Point was dated January 23, 1995.

Electronics now claims that Bell Atlantic's direct sales force improperly interfered with its potential sales to Cedar Point members. As a result, Electronics asserts that it has "suffered substantial damages in the form of lost commissions, lost revenues from servicing the equipment of these customers, lost sales of related equipment to these customers, and other lost profits, and future lost revenues and lost business potential."

Electronics filed a complaint against Bell Atlantic in the Circuit Court for St. Mary's County alleging breach of contract, tortious interference with a contract, tortious interference with business relations, unfair competition, concerted refusal to deal, and civil conspiracy. The complaint included counts against Cedar Point for concerted refusal to deal and civil conspiracy. Following a hearing, the trial court granted appellees' motions for summary judgment on all counts. This appeal followed.

## DISCUSSION

Appellant contends that the trial court erred in granting summary judgment in favor of Bell Atlantic on appellant's claims for: 1) breach of contract; 2) interference with Electronics's contracts and business relations; and 3) unfair competition and civil conspiracy.

Bell Atlantic argues that its actions could not constitute a breach of the Agreement because under the Agreement: 1) Electronics was not permitted to sell to corporate accounts at discounted prices; and 2) Bell Atlantic was permitted to reject the enrollment of any subscriber, in its sole discretion. Bell Atlantic also argues that it cannot interfere with a contract or business relationship to which it is a party, it did not unfairly compete against Electronics, and Electronics did not offer any evidence of a conspiracy or restraint on trade. Co-appellees, Cedar Point, contend that Electronics failed to present evidence to support the claims of concerted refusal to deal or conspiracy.

# I.

## Standard of Review

Maryland Rule 2–501(e) provides that a court may grant a motion for summary judgment "in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In considering a motion for summary judgment, the trial court does not determine any disputed facts, but instead rules on the motion as a matter of law. *See Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993). The court views the facts, including all inferences, in the light most favorable to the party against whom the court grants the judgment. *See Beard v. American Agency Life Ins. Co.,* 314 Md. 235, 246, 550 A.2d 677 (1988).

In reviewing the trial court's decision, we must determine whether the trial court was legally correct in granting summary judgment, since a trial court decides issues of law, not fact, when granting the motion. *See Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990). We are therefore confined ordinarily to the basis relied on by the trial court in our review. *See Warner v. German,* 100 Md.App. 512, 517, 642 A.2d 239 (1994).

# II.

## Breach of Contract

The trial court determined that, by reason of the plain terms of the Agreement, Electronics's claim for breach of contract fails as a matter of law. The court relied on a section of the Agreement requiring Electronics to solicit subscribers using the specific process set forth, including the use of Bell Atlantic's service forms and approval by Bell Atlantic.

The court found that Electronics failed to state a single instance where the requirements of the Agreement were satisfied and a commission was not paid. In granting the summary judgment, the trial court relied on *Sinopoli v. North*

*River Ins. Co.,* 244 N.J.Super. 245, 581 A.2d 1368, 1370 (App.Div.1990), *cert. denied,* 127 N.J. 325, 604 A.2d 600 (1991), for the proposition that if the terms of the contract are clear and unambiguous, the court will not distort the language of the contract.

We agree with the trial judge that not all the steps required to be completed by Electronics to fully earn a commission had occurred. The inquiry regarding whether a breach occurred, however, is more properly focused on whether Electronics was entitled to receive a price quote from Bell Atlantic for its proposed solicitation of subscribers from Cedar Point by reason of the language in the Agreement that "[p]otential Subscribers may be drawn from all classes of potential users...."

 By virtue of a governing law provision in the Agreement, New Jersey law governs its interpretation. In New Jersey, a contract is construed against the party drafting it, *see Michaels v. Brookchester, Inc.,* 26 N.J. 379, 140 A.2d 199, 204 (1958), but when the language of the contract is plain and unambiguous, it is not construed against either party. *See Sinopoli,* 581 A.2d at 1370. As in Maryland, a contract must be interpreted in its entirety, rather than construing a provision separate from the surrounding text. *Compare Nester v. O'Donnell,* 301 N.J.Super. 198, 693 A.2d 1214, 1220 (App.Div. 1997), *and Dahl v. Brunswick Corp.,* 277 Md. 471, 478–79, 356 A.2d 221 (1976).

a.

### The Meaning of "all classes of potential users"

Bell Atlantic contends that it had no obligation to quote a discounted price for Cedar Point because Electronics had no authority to sell to major customers under a discounted pricing program. Electronics contends that it did have such right, relying on Section 3.2 of the Agreement, titled *"Solicitation and Enrollment."* This section provides in pertinent part:

Agent shall retain and train salespersons in the enrollment of Subscribers, the operation of [cellular service] and the sale, lease, and rental of Equipment. Bell Atlantic shall

have the sole right in its discretion to reject the enrollment of any Subscriber. Agent shall solicit Subscribers by using Bell Atlantic's [cellular service] agreements and forms (the 'Service Forms'), and shall comply with all Bell Atlantic procedures and practices for solicitation of, presentations to, and enrollment of, Subscribers. *Potential Subscribers may be drawn from all classes of potential users,* excepting individual Subscribers currently assigned a Number(s) by or through Bell Atlantic or its resellers....

(Emphasis added). Electronics points out that there is no provision in the Agreement addressing the prices to be charged to subscribers except that amended Section 2, titled *"Relationship of the Parties,"* provides:

Nothing herein shall restrict or prohibit Bell Atlantic from, in its sole discretion, offering potential Subscribers in the Area, through its direct sales force or otherwise, volume discounts, promotional offers, new or modified price plans or any other special offers of [cellular service].

We agree with Bell Atlantic that if the Agreement did not permit Electronics to obtain subscribers by soliciting major accounts at discounted prices, then Bell Atlantic would have had no obligation to quote a price to Electronics for Cedar Point members. This would be so under applicable contract principles, including the implied covenant of good faith and fair dealing, which we discuss below.

██ The Agreement, however, does not clearly and unambiguously provide that obtaining subscribers from solicitation of major accounts at discounted prices is excluded from the scope of Electronics's agency relationship with Bell Atlantic. The phrase "all classes of potential subscribers" can reasonably be interpreted to include a group of subscribers who are affiliated with a major corporation or other entity, even if discounted prices are utilized to solicit the business. There is no definition in the Agreement for "classes," and when asked at oral argument, counsel for Bell Atlantic could not offer any better interpretation of the term.

The mere fact that the Agreement reserves to Bell Atlantic the right to offer volume discounts, through its direct sales

force or otherwise, does not mean that subscribers obtained by quoting volume discounts are excluded from Electronics's non-exclusive agency. Indeed, Bell Atlantic has the right to solicit and sell, by in-house sales agents, to *any* subscriber in the territory covered by the Agreement, co-extensive with and in direct competition with Electronics.

Other documentation supports the interpretation advanced by Electronics. In a document titled, "Direct and Indirect Channel Guidelines—Rules of Engagement," Bell Atlantic set forth the rules relating to "[p]rospecting a corporate account" as follows:

> The prospecting efforts of the indirect sales force will be focused on small to medium businesses. The prospecting efforts of the direct sales force will be focused on medium to large corporate businesses. These guidelines **do not prohibit either channel from prospecting any potential customer,** but each channel should concentrate their prospecting efforts on their respective target market.

(Emphasis in original). This language supports, but does not compel, the inference that the Agreement permitted Electronics, as Bell Atlantic's agent, to solicit Cedar Point, even though its target market may have been small to medium businesses.

There was also deposition testimony supporting Electronics's interpretation. Stephen Snider, a former sales executive at Bell Atlantic, testified with regard to the major price plan request form:

> A: First [in time to submit the form] doesn't have anything to do with it. The direct channel can submit it on one date. The Electronics Store can submit it on another date. Okay? So as long as the account hasn't been set up, and as long as it is a clean document, okay, that is, all filled out, it can be signed.
>
> The only thing—let me be clear about this. The only thing [the major pricing plan request form] does . . . [i]s it gives a selling entity the opportunity to offer the customer a price.

Mr. Snider's testimony continued as follows:

> Q. But you wouldn't have told the other entity, Electronics Store, on January 5, 1995, don't submit [the request form]

because we're not going to let you do it? You wouldn't have told them that?

A. No, I wouldn't have told them that.

Q. And [the request form] has to be submitted before you give them the contract to offer the plan; isn't that correct?

A. Yeah, that's correct.

This deposition testimony could also support the inference that the Agreement contemplated that Electronics could enroll subscribers in major discounted pricing plans.

We do not think that the Agreement is clear and unambiguous, however, that a group subscriber induced by a corporate discount plan is *necessarily* included within the scope of Electronic's agency. The Agreement does not: 1) mention that Electronics may quote discounted prices; 2) address the prices Electronics may offer; or 3) state whether the prices are retail or discounted for volume. Because the Agreement is ambiguous on this issue, the interpretation of this aspect of the contract becomes one for the jury to decide. *See Michaels*, 140 A.2d at 204.

## b.

### Implied Covenant of Good Faith and Fair Dealing

Paula Roark, President of Electronics, testified that she spoke to Craig Hall, a representative from Bell Atlantic, several times about enrolling Cedar Point members. When she told Mr. Hall that Electronics was interested in enrolling Cedar Point members, she was told by Mr. Hall that "Bell Atlantic does not do credit unions . . . but he would check into it." She further testified that he later told her that he checked into it and said, "No way, [Bell Atlantic] . . . does not do credit unions."

Bell Atlantic argues that the alleged statements by its employee, Craig Hall, were justified because it had the exclusive right to reject potential subscribers. Specifically, the Agreement provides that "Bell Atlantic shall have the sole right in its discretion to reject the enrollment of any Subscriber." Bell Atlantic contends that this provision effectively

gives it the ability to reject any potential subscriber that Electronics submits to it for approval, and therefore, the refusal to give Electronics a price quote for Cedar Point cannot support a breach of contract action. Such argument might prevail if the circumstances surrounding the refusal were different. Under the present alleged circumstances, however, Bell Atlantic's argument fails to account for the restraints imposed upon a contracting party under the implied covenant of good faith and fair dealing. We explain.

 Although the Agreement may allow Bell Atlantic to reject any potential subscriber, it still must exercise this right in good faith. In New Jersey, every contract contains an implied covenant of good faith and fair dealing. *See, e.g., Pickett v. Lloyd's,* 131 N.J. 457, 621 A.2d 445, 450 (1993). The Supreme Court of New Jersey has stated:

> In every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.'

*Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 207 A.2d 522, 531 (1965) (quoting 5 *Williston on Contracts* § 670, at 159–60 (3d ed.1961)). This obligation to act in good faith also exists in "contracts that contain express and unambiguous provisions...." *Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 690 A.2d 575, 587 (1997) (citing *United Roasters, Inc. v. Colgate–Palmolive Co.,* 649 F.2d 985 (4th Cir.), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981)).

Bell Atlantic argues that the circumstances alleged could not constitute a breach because, under the Agreement, Bell Atlantic had the right to reject any prospective subscriber. The commission to Electronics was not due until the Subscriber was "obtained by [Electronics] and accepted by Bell Atlantic," and "[e]ach subscriber [would] be deemed effective upon installation of Subscriber's Equipment and upon activation by Bell Atlantic." Further, it relies upon the Agreement provi-

sion, stating that "[n]o contract between Bell Atlantic and a Subscriber shall exist until the Service Form is accepted and approved by Bell Atlantic." Read literally and technically, Bell Atlantic has fully performed its obligations under the Agreement because the subscribers were not accepted by Bell Atlantic. Such literal interpretation, however, fails to take into account Bell Atlantic's obligation of good faith and fair dealing.

In *Sons of Thunder*, the Supreme Court of New Jersey analyzed New Jersey's common law doctrine recognizing an implied covenant of good faith and fair dealing. There, the court examined an agreement between a waterman who operated a clam-fishing vessel and a company that produced clam products. Years after the agreement, the company failed to purchase its required minimum amount of shell stock under the agreement and failed to pay the price required by the contract. The company subsequently notified the waterman that it was terminating the contract. The waterman sued the company for breach of contract, alleging a failure to purchase the agreed amount of shell stock both prior to and after the termination date. The company filed a motion for partial summary judgment on the issues of breach, as well as damages subsequent to the termination of the contract. It argued that the termination was expressly permitted by the contract. *See id.* at 581. The trial court denied the motion based, in part, on its finding that the affidavits presented in support of the motion were sufficient to raise a question of fair dealing. *See id.* at 582. Following a trial, the jury found that, although the termination was consistent with the agreement, there was a breach of the implied covenant of good faith and fair dealing. *See id.* The trial court affirmed the jury's verdict by denying a motion for judgment notwithstanding the verdict. The trial court reasoned that the determination of whether the implied covenant of good faith and fair dealing is breached must be examined from the entire conduct of the party while performing its duty under the agreement. *See id.* at 583. This inquiry creates an issue for the jury. *See id.*

The intermediate appellate court of New Jersey reversed the trial judge and held that "the right . . . to terminate the contract on ninety-days notice in accordance with its express terms cannot be overridden or eliminated by an implied covenant of good faith and fair dealing." *Id.* at 584. The New Jersey Supreme Court reversed the intermediate court's decision and held that a jury could reasonably determine that a party breached the implied covenant of good faith and fair dealing even though there was no breach of any express provision of the contract. *See id.* at 589. The court reasoned that the issue of whether a party breached an express provision of the contract was a separate and distinct issue from whether the implied covenant of good faith and fair dealing was breached. *See id.* at 586–87. The court further opined that when a jury is properly instructed, it can reasonably infer that a party has breached the implied covenant without breaching the express contract provisions. *See id.*

The present case is comparable to *Sons of Thunder* because in each case, the alleged breaching party complied with all of the literal terms of the contract in question. What *Sons of Thunder* makes clear, however, is that, under New Jersey law, compliance with literal terms is not sufficient unless the standards of good faith and fair dealing are met.

■ A brief review of some commentary addressing this implied covenant is instructive. Professor Corbin observed that, "even though the express terms of a contract appear to permit unreasonable action, the duty of good faith limits the parties' ability to act unreasonably in contravention of the other party's reasonable expectations." 3A Arthur L. Corbin, *Corbin on Contracts* § 654A(B), at 106 (Cum.Supp.1999); *see also Sterling Nat'l Mortgage Co. v. Mortgage Corner, Inc.*, 97 F.3d 39, 42 (3d Cir.1996). The United States District Court for the District of New Jersey, applying New Jersey law, recently approved Williston's statement that, "Included in every contract is 'an implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." ' " *Emerson Radio Corp. v. Orion Sales, Inc.*, 41

F.Supp.2d 547, 551 (D.N.J.1999) (quoting *Palisades Proper-ties*, 207 A.2d at 531, in turn quoting 5 Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts* § 670, at 159–60 (3d ed.1961)). "Where fairness and justice require, even though the parties to a contract have not ex-pressed an intention in specific language, the courts may impose a constructive condition to accomplish such a result when it is apparent that it is necessarily involved in the contractual relationship." *Palisades Properties*, 207 A.2d at 531. The Supreme Court of New Jersey drew on the eloquent words of Justice (then Judge) Cardozo to explain the develop-ment of this doctrine:

> 'The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed....'

*Id.* (quoting *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214, 214 (1917)).

■ In the present case, applying New Jersey law, and viewing the facts and inferences in the light most favorable to appellant, we find sufficient evidence to foreclose the entry of summary judgment on count one, alleging breach of contract. Bell Atlantic was in direct competition with Electronics. Ac-cording to the evidence before the trial court, Electronics contacted Bell Atlantic to inquire about enrolling Cedar Point members as cellular subscribers. In response, Bell Atlantic said that it would not allow Electronics to enroll Cedar Point because it was a credit union. Shortly thereafter, the direct sales force from Bell Atlantic entered a contract with Cedar Point. This action was directly contrary to its previous state-ment to Electronics, and allows the inference that the first statement was untruthful and self-serving. *See* Restatement (Second) of Contracts § 205 cmt. d (1981) ("Subterfuges and evasions violate the obligation of good faith in perfor-mance....").

There is other evidence to support an inference that Bell Atlantic breached the covenant of good faith and fair dealing.

Stephen Snider, former Bell Atlantic executive sales agent, testified that the selling entity normally would submit a request to give the customer a pricing plan. He also testified that he would not have told Electronics not to submit the pricing request for Cedar Point. Under the circumstances, his testimony supported the inference that, in this instance, Bell Atlantic's refusal to quote a price to Electronics was not "business as usual." Combined with the evidence that Bell Atlantic promptly offered services to Cedar Point through a direct sales force (and therefore at a lesser cost to Bell Atlantic), Snider's testimony would support at least two inferences of fact that could be drawn by a jury, which would amount to a breach of the implied covenant of good faith and fair dealing. First, Snider's testimony would support an inference that Bell Atlantic was untruthful when it said, through its agent, Mr. Hall, that it did not "do credit unions." Second, this, combined with other evidence, could support an inference that Bell Atlantic utilized the information given to it by Electronics to thereafter solicit and make a contract with Cedar Point for its members to be subscribers. While the jury might not draw either of these inferences, it is a jury function to make this decision. *See Michaels,* 140 A.2d at 204.

Although Electronics never reached the point of submitting service forms to Bell Atlantic for members of Cedar Point, this failure was induced by Bell Atlantic and does not preclude a jury from determining that Electronics is entitled to damages for a breach of contract by Bell Atlantic. The commissions were the "fruits of the contract" to be earned by Electronics. When Bell Atlantic claimed that it did not deal with credit unions and refused to authorize a price for Electronics to offer to Cedar Point, and almost immediately signed up Cedar Point itself, it may have deprived Electronics of the "fruits" of the Agreement.

### c.

### Summary of Contract Issues

We find that there is sufficient ambiguity in the Agreement to create a jury question of whether Electronics had the right

to solicit major corporate accounts. If so, then although Bell Atlantic may not have been required to pay a commission to Electronics until the subscriber was approved and activated by Bell Atlantic, and it had a right under the Agreement to reject any potential subscriber, Bell Atlantic may still have breached the Agreement by failing to deal fairly and act in good faith. This is a determination which must be made by the trier of fact.

Accordingly, we remand the case to the circuit court for further proceedings on this count.

## III.

### Tortious Interference With Contract and Business Relations

In counts two and three of its complaint, appellant attempts to allege a cause of action for tortious interference with its contracts and business relations. Again, its claim centers on Bell Atlantic's refusal to allow Electronics to sell cellular service to Cedar Point members. Appellant, in its brief, devotes only nine lines to these counts, citing no law and only one record citation. It simply asserts that "Bell Atlantic and Electronics compete directly for not only commissions for the sale of telephone service, but also for the sale of products to these customers" and that "Electronics has proved all the necessary elements of these torts." General allegations are insufficient to defeat an entry of summary judgment. *See Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 243, 603 A.2d 1357 (1992). Further, it is not this Court's responsibility to attempt to fashion coherent legal theories to support appellant's sweeping claims. *See Pierce v. State*, 34 Md.App. 654, 656 n. 1, 369 A.2d 140 (1977). Thus, we shall be brief in rejecting appellant's claims in this regard.

It is clear that Bell Atlantic is a party to all subscriber agreements for Bell Atlantic cellular service. With regard to tortious interference with contractual or business relations, "[f]or the tort to lie, the defendant tortfeasor cannot be a party to the contractual or economic relations with which he

has allegedly interfered." *Travelers Indem. Co. v. Merling,* 326 Md. 329, 343, 605 A.2d 83, *cert. denied,* 506 U.S. 975, 113 S.Ct. 465, 121 L.Ed.2d 373 (1992); *accord K & K Management, Inc. v. Lee,* 316 Md. 137, 154–55, 557 A.2d 965 (1989); *Wilmington Trust Co. v. Clark,* 289 Md. 313, 329–30, 424 A.2d 744 (1981); *see also Cutter v. Lincoln Nat'l Life Ins. Co.,* 794 F.2d 352, 357 (8 th Cir.1986) (analyzing the tort of interference with business relations in an analogous agency relationship).

■■■ With respect to appellant's argument that Bell Atlantic interfered with its business relations relating to the sale of cellular telephone products to Cedar Point members, Electronics has not pointed to any factual evidence to show that an independent contract or other legally protected relationship existed with such members. We are not obligated to comb the record in an effort to assemble facts to support appellant's claim. *See Fairfax Sav., F.S.B. v. Weinberg and Green,* 112 Md.App. 587, 595 & n. 2, 685 A.2d 1189 (1996). We perceive no error in the trial court's granting of summary judgment on these counts.

## IV.

### Unfair Competition

In count four, appellant sued Bell Atlantic for the common law tort of unfair competition, and argues in its brief that "[s]ince Bell Atlantic has been deceitful and unfair in its relations with Plaintiff, it is guilty of unfair competition." The trial court granted summary judgment against Electronics on the grounds that the Agreement expressly reserved to Bell Atlantic the rights to make sales in the same area, use its own sales force, and deny enrollment to potential subscribers obtained by Electronics. The court concluded that Electronics "entered into an agreement with [Bell Atlantic] under those terms and cannot now be heard to complain that the assertion of those rights reserved by [Bell Atlantic], somehow amounts to fraud, deceit or trickery."

The Court of Appeals has examined this common law action in *Baltimore Bedding Corp. v. Moses,* 182 Md. 229, 34 A.2d

338 (1943). There, the Court explained that the common law action has been extended to "all cases of unfair competition in the field of business." *Id.* at 236, 34 A.2d 338. The rationale of the law is that "no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Id.* at 237, 34 A.2d 338. The Court added:

What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

*Id.*

The Court of Appeals in the case of *Edmondson Village Theatre, Inc. v. Einbinder,* 208 Md. 38, 116 A.2d 377 (1955), wrote:

Like most doctrines of the common law, the law of unfair competition is an outgrowth of human experience. The rules relating to liability for harm caused by unfair trade practices developed from the established principles in the law of torts. These rules developed largely from the rule which imposes liability upon one who diverts custom from another to himself by fraudulent misrepresentation. . . .

*Id.* at 43, 116 A.2d 377. This Court has noted with regard to unfair competition: " 'The legal principles which are controlling here are simply the principles of old-fashioned honesty. One man may not reap where another has sown, nor gather where another has strewn.' " *GAI Audio of New York, Inc. v. Columbia Broadcasting Sys., Inc.,* 27 Md.App. 172, 192, 340 A.2d 736 (1975) (quoting *J.I. Case Plow Works v. J.I. Case Threshing Mach. Co.,* 162 Wis. 185, 155 N.W. 128, 134 (1915)).

In the present case, viewing the facts in a light most favorable to Electronics, we conclude that if a jury finds that Electronics was authorized to solicit major corporate accounts, and it finds that Bell Atlantic was deceitful in telling Electronics that it did not "do credit unions," then it could find Bell

Atlantic committed the common law tort of unfair competition involving deceit. Thus, we reverse the trial judge's entry of summary judgment with regard to this count.

## V.

### Concerted Refusal to Deal and Civil Conspiracy

Appellant argues that both Bell Atlantic and Cedar Point violated Md.Code (1975, 1990 Repl.Vol.), § 11–204(a)(1) of the Commercial Law Article (hereinafter CL) (Antitrust Act). Section 11–204 states, in pertinent part:

(a) *Prohibited conduct.* —A person may not:

(1) By contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce; ...

■ The legislature has provided that, in construing the Antitrust Act, "the courts [are to] be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters...." *See* CL § 11–202(a)(2). "As interpreted by the Supreme Court, § 1 of the Sherman Act renders unlawful only those restraints of trade which are unreasonable." *Natural Design v. Rouse Co.*, 302 Md. 47, 54, 485 A.2d 663 (1984). The Court in *Natural Design* analyzed a trade restraint claim between a landlord and tenant. In discussing whether there was sufficient evidence to support a contract, combination, or conspiracy, it explained that "Section 1 of the Sherman Act does not reach entirely unilateral conduct." *Id.* at 60, 485 A.2d 663. In order to survive a motion for summary judgment, " '[t]here must be evidence that tends to exclude the possibility that the [alleged conspirators] were acting independently.' " *Id.* at 61–62, 485 A.2d 663 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)).

■ "To establish knowledge of or participation in the conspiracy ... [a party] need not show a contract expressly imposing a legal obligation on the part of [another party] to participate or facilitate the conspiracy." *Cavalier Mobile*

*Homes, Inc. v. Liberty Homes, Inc.,* 53 Md.App. 379, 386, 454 A.2d 367 (1983). An implied contract, combination, or conspiracy can occur from the circumstances surrounding the parties' relationship, including a course of dealing. *See id.* Thus, the plaintiff must only establish " 'a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.' " *Id.* (quoting *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)).

■■■ "There is a limit, however, to the degree of indirection and innuendo which the law will tolerate. Where ... the plaintiff's case is based entirely on such circumstantial evidence, the court must be especially vigilant to insure that liberal modes of proof do not become the pre-text for unfounded speculation." *Overseas Motors, Inc. v. Import Motors Ltd., Inc.,* 375 F.Supp. 499, 531 (E.D.Mich.1974), *aff'd,* 519 F.2d 119 (6th Cir.1975), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

■■■ We are satisfied that the trial court followed this standard. Its review of the evidence disclosed a dearth of facts relating to a conspiracy, contract, or combination between Bell Atlantic and Cedar Point to act in an unlawful manner. Our review yields the same result. The trial judge ruled that there was no antitrust violation and stated: "Absent from the record is evidence to support [appellant's] contention of a [Bell Atlantic] and Cedar Point conspiracy. Since, in the absence of a conspiracy, a business is free to deal with whomever it chooses, the antitrust laws do not apply in this case." We agree.

Appellant argues that once contacted by Bell Atlantic, Cedar Point no longer would deal with Electronics. Appellant, however, produced no sufficient evidence to show that this alleged refusal to deal was a result of a meeting of the minds to achieve an unlawful objective. The evidence, in the present case, consisting of testimony and documents produced through discovery, simply fails to produce evidence supporting the inference that the entities were not acting independently.

Appellant also alludes to the cancellation, after only three months, of the walk-in contract, which allowed Electronics to offer Cedar Point members Bell Atlantic cellular service on a walk-in basis. Again, appellant has presented no sufficient evidence with regard to a conspiracy, contract, or combination between Cedar Point and Bell Atlantic to cancel Electronics's status as a walk-in retailer for Cedar Point members. When Cedar Point terminated its agreement with Electronics, the decision was made by Bill Hanford, CEO of Cedar Point Financial Services, Inc. In his affidavit, he stated that Electronics failed to abide by the agreement establishing Electronics as a walk-in retailer. He stated that Cedar Point "was inundated with constant phone calls from [Electronics] and/or its customers, demanding that their applications be approved for cellular service." He also stated that Ms. Roark contacted several non-Cedar Point members in an effort to sell service under the Cedar Point pricing plan, an act directly forbidden by the agreement. Most important, he stated that

[t]he decision to disallow any further solicitations by [Electronics] of Cedar Point's members was not made at the request of Bell Atlantic, but rather, after it was concluded that [Electronics] was a disruption to the operations of [Cedar Point] and was engaging, after receiving instructions to the contrary, in the marketing of cellular phones and service to non-members of Cedar Point and/or non-credit worthy applicants.

In his deposition, Hanford also discussed the termination of Electronics as a retailer for Cedar Point members:

Q: Did you discuss with any representative of Bell Atlantic Mobile your decision to terminate [Electronics's] involvement in the program before you informed [Electronics] of that decision?

A: No, I did not.

Q: That was your decision?

A: It was strictly my decision.

Electronics was unable to produce evidence that Hanford acted in concert with Bell Atlantic.

Lastly, appellant argues that Bell Atlantic was in the business of not only selling cellular telephone service, but also cellular telephone products. It argues that Bell Atlantic sold phones to customers "at any price they wished to, including below cost as a matter of course." (Emphasis omitted). It contends that this conduct was "motivated by an unlawful objective ... [and] was unreasonable in its restraint [which] caused Electronics and the public injury." We dispose of this argument in the same manner as the other contentions related to a concerted refusal to deal. There simply is no evidence to support an agreement between Bell Atlantic and Cedar Point, and we affirm the trial court's granting of summary judgment on this count.

For the common law civil conspiracy claim to survive summary judgment, appellant also must produce evidence to prove an agreement between Bell Atlantic and Cedar Point to engage in unlawful activity. *See Cavalier*, 53 Md. App. at 389–90, 454 A.2d 367. There can be no conspiracy where there is no agreement. *See id.* at 389, 454 A.2d 367. We conclude that the trial judge did not err in granting summary judgment on this conspiracy count.

## CONCLUSION

For the reasons stated above, we affirm the trial court's decision with regard to counts two, three, five, and six. We reverse the trial court's decision on counts one and four, and remand the case to the Circuit Court for St. Mary's County for further proceedings consistent with this opinion.

**JUDGMENT AFFIRMED IN PART, REVERSED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR ST. MARY'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID ONE-HALF BY APPELLANT AND ONE-HALF BY APPELLEE, BELL ATLANTIC.**