**SOUTHERN VOLKSWAGEN, INC., et. al., Plaintiffs**

v.

**CENTRIX FINANCIAL, LLC, Defendant**

**No. RWT 04–CV–2577.**

United States District Court, D. Maryland.

Feb. 15, 2005.

Brad D. Weiss, Charapp Deese Weiss LLP, Washington, DC, for Plaintiffs.

Jeffrey S. Jacobovitz, Kutak Rock LLP, Washington, DC, for Defendant.

## MEMORANDUM OPINION

TITUS, District Judge.

The Plaintiffs, Southern Volkswagen, Inc. and seven other car dealers, filed a Complaint in the Circuit Court for Prince George's County, Maryland asserting claims for damages and equitable relief based on alleged violations of state antitrust statutes and the commission of various torts by the Defendant Centrix Financial, LLC ("Centrix"), a financial services firm that arranges financing for "credit-challenged individuals." After removing the case to this Court, Centrix filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. The Court has considered the memoranda of the parties and the arguments of counsel. For reasons explained below, the Motion will be granted with thirty days leave granted to file an Amended Complaint conforming to the requirements of this opinion.

## BACKGROUND

As part of its business as a financing services firm [1] Centrix enters into dealer agreements with car dealerships. The Plaintiffs' most significant allegations stem from the alleged refusal by Centrix to enter into such a dealer agreement with them. Plaintiffs allege that Centrix entered into dealer agreements with their competitors in Maryland and Virginia, but refused, and continues to refuse, to enter into an agreement with them. Compl. ¶ 7. Plaintiffs also proffer reasons why Centrix refuses to deal with them.

Plaintiffs allege that the refusal by Centrix to deal with them is due to an alleged agreement between Centrix and one or more unidentified competitor(s) of Plaintiffs. Id. at ¶ 8, 17. Plaintiffs also claim that one of their competitors told Centrix that "Southern was a fraud and being investigated for fraud crimes with banks and customers." Id. If all that happened was that a competitor of Plaintiffs told Centrix that "Southern was a fraud" and Centrix subsequently refused to enter into an agreement with the Plaintiffs, it is clear that no cause of action against Centrix would lie. However, reading the Complaint in a light most favorable to the

---

1. According to Centrix's website, "CENTRIX does not make auto loans itself. Rather, the Company has developed a national network of financial institutions to fulfill lending needs." www.centrixfinancial.com/financialinstitutions/index.html

Plaintiffs, it appears that the Plaintiffs are alleging that the statement, made by one of Plaintiffs' competitors to Centrix, induced Centrix to *enter into an agreement* with one or more of Plaintiffs' competitors whereby Centrix agreed not to contract with at least one of the Plaintiffs.[2]

Plaintiffs assert numerous causes of action arising out of the alleged refusal by Centrix to deal and the surrounding circumstances. Count I alleges a violation of Section 11–204(A)(1) of the Maryland Antitrust Act. Count II alleges a violation of the Maryland common law tort of Unfair Competition. Count III alleges Defamation and Invasion of Privacy—False Light. Count IV alleges Tortious Interference with Business Relations and Prospective Business Relations. Count V alleges a Civil Conspiracy to Unreasonably Restrain Trade in Violation of Maryland Common Law.

## DISCUSSION

Rule 8(e)(1) of the Federal Rules of Civil Procedure requires that "[e]ach averment of a pleading shall be simple, concise and direct." Had this simple admonition been followed, the task of the Court would have been far easier in evaluating the sufficiency of the various causes of action asserted in the Complaint. The purpose of this command of Rule 8(e)(1) is to give a defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S.

41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In order for a complaint to be sufficient under Rule 8(e)(1), its allegations must be "detailed and informative enough to enable the defendants to respond." 5 CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1215 (3d ed.2004).

Rule 8(a)(2) also requires that a party's claim for relief be "short and plain." This command supplements the "simple, concise and direct" requirement of Rule 8(e)(1). Taken together, the two rules "underscore the emphasis placed on clarity and brevity by the federal pleading rules." WRIGHT & MILLER, *supra* at § 1217. These basic requirements are violated by a complaint that is "needlessly long, . . . highly repetitious, or confused." *Id.* The twenty-page Complaint in this case is not, by virtue of its length alone, problematic. Rather, it is the confusing, overlapping and frequently inconsistent allegations contained in the Complaint that make the task of the Court much more difficult. For reasons explained below, the Court concludes that the Motion to Dismiss should be granted, but that thirty days leave to re-plead should be granted consistent with, and subject to the limitations of, this Opinion.

Each claim will be considered under the forgiving standard of Rule 12(b)(6). "A Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true,

---

**2.** As discussed below, the Plaintiffs' Complaint is unclear and ambiguous in many respects, and contains typographical errors in key paragraphs. For example, Paragraph 8 of the Complaint states that "an authorized agent and employee of Centrix[ ] told [an agent of Southerns] that Defendant Centrix could not contract with Southern because a competitor of Southern had an agreement with upper management of Centrix *not* specifically setting forth that Centrix could not contract with Southern." Compl. ¶ 8 (emphasis added). The Court also has difficulty under-

standing whether the statement made regarding fraud was in reference to all the Plaintiffs or just one of them, Southern Volkswagen, Inc. At oral argument, counsel for Plaintiffs proffered that the statement was directed towards all Plaintiffs, but the Court has difficulty understanding how such a statement could be interpreted that way when there are eight separate plaintiffs. Considering the allegation as presently stated in the Complaint, even in the light most favorable to the Plaintiffs, the alleged statement does not seem to be directed to *all* Plaintiffs.

it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Migdal v. Rowe Price–Fleming Int'l, Inc.,* 248 F.3d 321, 325 (4th Cir.2001) (citing *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999)). In its determination, the court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir.1999). The Court need not, however, accept unsupported legal conclusions, *District 28, United Mine Workers of America, Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1085 (4th Cir. 1979), or legal conclusions couched as factual allegations. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

Turning to the specific allegations of the Complaint, it is apparent that all the claims other than defamation and false light are either completely or partially contingent on the viability of the antitrust claim. Therefore, the Court will consider first the Plaintiff's defamation and false light claims.

### Defamation and False Light (Count III)

Rule 10(b) of the Federal Rules of Civil Procedure requires that "[e]ach claim founded upon a separate transaction or occurrence and each defense other than denial shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth therein." Notwithstanding this mandate of Rule 10(b), Count III of the Plaintiffs' Complaint is entitled "Invasion of Privacy—Defamation and False Light." While these claims should have been separated into at least two separate counts, the Court will disregard this violation of the

rules and address the sufficiency of the allegations with respect to each tort.

Before considering whether Plaintiffs' claims meet the elements of the torts at issue, it is necessary to examine Plaintiffs' allegations, which are not abundantly clear from the Complaint. The beginning of Plaintiffs' Complaint explains that one of Plaintiffs' competitors told Centrix that the Plaintiffs were a "fraud." *See* Compl. ¶ 8–16. This was the alleged reason why Centrix entered into the alleged agreement with that competitor, and perhaps others, to refuse to deal with Plaintiffs. *See id.* Thus, it seems clear that if an allegedly defamatory statement was made, it was made, at least originally, by a competitor of the Plaintiffs to Centrix. These facts, as stated in the beginning of the Complaint, do not support a cause of action for defamation or false light invasion of privacy against Centrix.

Later in the Complaint, however, Plaintiffs allege that an agent of Centrix "verbally told a competitor dealer representatives [sic] that Centrix would not do business with Southern because Southern was a 'fraud and being investigated for fraud crimes with banks and customers.'" Compl. ¶ 32. When considering paragraphs 8 and 32 of the Complaint together, it is not clear whether Plaintiffs are alleging that Centrix repeated the statement told to it by one competitor to that competitor or to another competitor. At oral argument, counsel for Plaintiffs asserted that the defamatory statement was made to an unidentified competitor other than the one who originally made the statement to Centrix. Viewing Plaintiffs' defamation and false light claims in a light most favorable to the Plaintiffs, they will be treated as averring that a competitor told Centrix that at least one of the Plaintiffs was a fraud, and, when explaining to another competitor why it

would not enter into an agreement with Plaintiffs, Centrix repeated that statement.

■ Applying the law of defamation to these facts, the Court begins with an examination of the necessary elements. "To recover for defamation under Maryland law, a plaintiff must establish that: (1) the defendant made a defamatory statement regarding the plaintiff to a third person; (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff suffered harm thereby." *Holt v. Camus*, 128 F.Supp.2d 812, 815 (D.Md.1999).

■ Plaintiffs' Complaint, as clarified by counsel at oral argument, meets the first element. It is without question that labeling an entity a "fraud" is a defamatory statement. At this stage of the litigation the Court must also deem the second element to be met. Although it may eventually be determined that the Plaintiffs have engaged in fraudulent activity, and could perhaps be under investigation, nothing in the Complaint suggests that such is the case. Thus, Plaintiffs have met the second element.

■ Plaintiffs have more difficulty meeting the third and fourth elements. The third element is a reference to the varying degrees of malice required, dependent on the status of the defamed person or entity. *See generally New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Plaintiffs contend that the statement was a *per se* defamatory statement, made with malice and the intent to cause injury to Plaintiffs. Compl. ¶ 34. Maryland courts "continue to recognize the distinction between defamation per se and defamation per quod." *Samuels v. Tschechtelin*, 135 Md.App. 483, 763 A.2d 209, 244 (2000) (citations omitted). "Whether an alleged

defamatory statement is per se or per quod is a question of law for the court." *Id.* at 244–45 (citations omitted). A statement which disparages the business reputation of a plaintiff is one of the categories traditionally considered to be defamation *per se*. *See* RESTATEMENT (SECOND) OF TORTS §§ 570, 573 (1977); 50 Am.Jur. § 141 (2004). Therefore, the Court concludes that Plaintiffs have alleged a statement which is defamatory *per se*, at least as to one Plaintiff.

■ Even though this statement is defamatory *per se, Samuels* explained that "if the statement is defamatory per se, damages are presumed when a plaintiff can demonstrate actual malice[.]" *Samuels*, 763 A.2d at 245. Thus, the Complaint must also allege that Defendant acted with actual malice. Plaintiffs attempt to meet this requirement by alleging that "Defendant Centrix had reason to know that such a statement was false and defamatory in nature because Centrix's CEO, Robert Sutton, had received a certified letter from Agustin Otero, Vice President of Southern Volkswagen, Inc., expressing concern over false and inaccurate statements being made to Centrix." Compl. ¶ 35. No averment is made as to whether this letter was sent or received prior to the date on which Centrix allegedly made its defamatory statement, nor is the date of the alleged defamatory statement by Centrix included in the Complaint. Although the context in which the alleged defamatory statement was made does not suggest malice or an attempt to injure the Plaintiffs, *i.e.* it seems likely that Centrix was explaining to a competitor of Plaintiffs why it was not going to deal with Plaintiffs, because "courts traditionally have viewed even poorly drafted complaints in a light most favorable to the plaintiff," *Holt*, 128 F.Supp.2d at 816 (citations omitted), the Court must accept Plaintiffs' assertion re-

garding Defendant's knowledge of the statement's falsity. An averment of knowledge that the statement was false is a sufficient allegation of actual malice. *See Samuels*, 763 A.2d at 245–47; RESTATEMENT (SECOND) OF TORTS § 580B. Therefore, analyzing Plaintiffs' claim as slander *per se*, the third factor is met.

■ Under Maryland law the fourth element in a claim for defamation requires an allegation that the Plaintiffs were harmed by the defamatory statement. Plaintiffs' overarching harm alleged in the Complaint is the decision by Centrix not to enter into an agreement with them. A statement made by Centrix to another competitor has no bearing on that harm.[3] Moreover, it is inconceivable that there would be any substantial harm to Plaintiffs' business arising from Plaintiffs' competitors being told that one or more of the Plaintiffs were a fraud. If consumers were made privy to the defamatory statement (which is not alleged), then Plaintiffs' claim might be viable. Plaintiffs' Complaint does not allege, however, that the defamatory statement was made to consumers, but rather that the defamatory statement was made to competitors, entities that were presumably trying to pull consumers away from the Plaintiffs. Thus, Plaintiffs' allegations that the Defendant made an allegedly defamatory statement to an unidentified competitor of the Plaintiffs would not meet the fourth element, except for the concept of defamation *per se*. Because Plaintiffs' Complaint sufficiently alleges a *per se* defamatory statement, it is unnecessary for Plaintiffs to allege actual harm at this stage. *See Samuels*, 763 A.2d at 246–47. Thus, Plaintiffs can meet the fourth element.

■ That does not, however, end the inquiry. Although some damage can be presumed from a statement that is defamatory *per se*, that is a far cry from a good faith allegation of damages in an amount sufficient to invoke the jurisdiction of this Court. It is difficult for the Court to conceive, under the circumstances as pleaded by the Plaintiffs, how the harm involved could equal, much less even approach, the jurisdictional limitations of this Court. 28 U.S.C. § 1332 (2004). Because of the numerous concerns expressed above concerning the inconsistencies and vagueness of the Complaint insofar as it asserts a cause of action for defamation, the Court will grant the Motion to Dismiss with respect to the defamation aspect of Count III, but will grant leave to re-plead a defamation count.

However, any re-pleading of the defamation count must include averments which, at a minimum, include (1) the identity of the maker of the defamatory statement; (2) the exact content of the defamatory statement; (3) the date on which the defamatory statement was made; (4) the persons to whom the defamatory statement was communicated; (5) the date on which Centrix was advised by the Plaintiffs of the falsity of the defamatory statement made to Centrix by one of the Plaintiffs' competitors; and (6) an averment of damages made with sufficient particularity to demonstrate a good faith basis for a claim for defamation that exceeds $75,000. Counsel is reminded of the provisions of Rule 11(b)(3) that specify that by presenting a pleading to the court, an attorney or a representative party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions have evidentiary support or, if specifically

---

**3.** A more appropriate claim for defamation would be against Plaintiffs' competitor who told Centrix that Plaintiffs are a "fraud." It was that statement which, according to the Plaintiffs, induced Centrix not to form a relationship with the Plaintiffs.

so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. The Court is understandably skeptical that damages in this amount can be claimed, but the Plaintiffs will be given the opportunity to make such an allegation, if a basis for it exists.

■ Plaintiffs' false light invasion of privacy claim also must fail. The Court of Special Appeals of Maryland has defined the tort of invasion of privacy by false light as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if (a) the false light in which the other person was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as the to the falsity of the publicized matter and the false light in which the other would be placed.

*Bagwell v. Peninsula Regional Medical Center*, 106 Md.App. 470, 665 A.2d 297, 318 (1995) (citations omitted). The *publicity* required for false light invasion of privacy differs greatly from the *publication* necessary to recover under defamation. It is this distinction which thwarts Plaintiffs' false light claim.

This Court explained the differences between defamation and false light invasion of privacy under Maryland law in *Robinson v. Vitro Corp.*, 620 F.Supp. 1066, 1070 (D.Md.1985). In that case, Judge Northrop first quoted the construction of the tort of false light invasion of privacy embraced by the Court of Appeals of Maryland: "The disclosure of the private facts must be a public disclosure, and not a private one; there must be, in other words, publicity[.]" *Hollander v. Lubow*, 277 Md. 47, 351 A.2d 421, 426 (1976) (citations omitted), *cert. denied* 426 U.S. 936,

96 S.Ct. 2651, 49 L.Ed.2d 388 (1976). Judge Northrop continued, stating that false light "is distinguished from defamation which requires only publication, and can be completed upon communication to only one person." *Robinson*, 620 F.Supp. at 1070.

Plaintiffs allege that "[o]nce the defamatory statement was published to a third person, said defamatory statement reached the public[,]" thus making out the prima facie tort of false light. *See* P's Opp. at 20. This assertion is simply wrong. The Complaint does not allege that the statement was widely disseminated as required to recover under false light. Thus, a statement made to one competitor does not amount to "publicity" and cannot form the basis of a claim for the tort of invasion of privacy by false light. Accordingly, Plaintiffs have not stated a claim for false light invasion of privacy. Perhaps it may be possible that an allegation of publicity can be made in an Amended Complaint. Counsel is reminded, once again, of the provisions of Rule 11(b)(3).

### Antitrust Claims (Count I)

The bulk of Plaintiffs' Complaint is an allegation of a violation of Section 11–204(a)(1) of the Maryland Antitrust Act. Besides forming the basis for Count I of the Complaint, the viability of this claim likewise affects Plaintiffs' claims for Tortious Interference, Unfair Competition, and Civil Conspiracy. Section 11–202(a) of the Maryland Antitrust Act provides that "the purpose of this subtitle is to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest intrastate competition." MD. CODE ANN., COM. LAW § 11–202(a)(1) (2004). Courts have therefore concluded that "federal court interpretations of similar federal laws should guide

the interpretation of the Maryland antitrust laws. Similarly, the federal district court has stated that state claims under section 11–204(a) and (b) must fail where those same claims would also fail under similar federal law." *Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 379 (4th Cir.1992) (citing *Purity Prods., Inc. v. Tropicana Prods., Inc.*, 702 F.Supp. 564, 574 (D.Md. 1988)); Md. Code Ann., Com. Law § 11–202(a)(2).

▇▇▇ The Plaintiffs argue vigorously that at the current stage of litigation, *i.e.* a Rule 12(b)(6) motion, the Court should permit this claim to proceed into the discovery stage even if the Court has great doubts about the eventual success of the Plaintiffs. In support of this position, Plaintiffs cited at oral argument a recent decision by Judge Andre Davis of this Court in which he did not dismiss an antitrust claim at the 12(b)(6) stage even though he concluded that the Defendants "made cogent and compelling arguments, well-supported by citations to highly relevant if not controlling case law (to which plaintiff has offered scant contrary analysis), suggesting that plaintiff and plaintiff's attorneys have embarked on a spurious fishing expedition for facts in support of bloated and misguided claims[.]" *Fare Deals, Ltd. v. Glorioso*, 217 F.Supp.2d 670, 671 (D.Md.2002). What Plaintiffs did not address, however, is a case decided subsequent to *Fare Deals* in which the Fourth Circuit gave definitive guidance concerning the resolution of *antitrust claims* at the 12(b)(6) stage. The Fourth Circuit stated:

> We recognize that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, and that an antitrust complaint should not be dismissed at the 12(b)(6) stage merely because the court doubts the plaintiff will ultimately prevail. Nevertheless, to avoid dismissal for failure to state a claim, the plaintiff

must colorably state facts which, if proven, would entitle him to relief.

*Dickson v. Microsoft Corp.*, 309 F.3d 193, 212 (4th Cir.2002) (internal citations and quotations omitted). Thus, Plaintiff "may not evade [Rule 12(b)(6)] requirements by merely alleging a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust." *Id.* at 213 (quoting *Car Carriers. Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984)).

▇▇▇ Plaintiffs' claims, stated as a violation of Maryland Antitrust law, are most analogous to § 1 of the Sherman Act. 15 U.S.C. § 1 (2004). Under federal antitrust law, the Sherman Act is violated only by agreements which unreasonably restrain trade. *See generally Standard Oil of N.J. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Over the last century, however, courts have identified certain kinds of agreements whose effect on competition is so pernicious that they can be deemed to be unreasonable without proof of anticompetitive effect in that particular instance. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). "An agreement of such a kind is unlawful *per se.*" *Id.* (citing *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)); *see also* Herbert Hovenkamp, Federal Antitrust Policy § 6.4a (2d ed. 1999) ("A *per se* rule is generally appropriate only after judges have had long experience with a certain practice, and have concluded that the practice produces many pernicious results and almost no beneficial ones."). Agreements which are not deemed to be *per se* violations of the antitrust laws are evaluated under rule of reason analysis, weighing the procompetitive and anticompetitive effects

of the agreement in question. *See generally Chicago Bd. of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Thus, a threshold matter for a court to determine in an antitrust case is whether the agreement in question fits into one of the narrowly delineated agreements deemed to be *per se* violations. "Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (citations omitted).

In the current case, Plaintiffs argue that the agreement between Centrix and either one or more of Plaintiffs' unidentified competitors constitutes a group boycott and is therefore a *per se* violation. In Plaintiffs' Response in Opposition to the Motion to Dismiss, they assert, in the alternative, that if the Court determines that the agreement should be analyzed under the rule of reason, they have sufficiently pleaded facts to permit this case to proceed beyond the 12(b)(6) stage. However, when questioned at oral argument about the lack of any allegations in the Complaint concerning Defendant's market power in the automobile credit market (a market which is or has the potential to be international in scope), Plaintiffs' counsel contended that their Complaint was premised upon a *per se* violation and not the rule of reason. This would explain the Plaintiffs' failure to allege market power,[4] and would also explain the inadequacy of facts alleging injury to competition, rather than injury only to the Plaintiffs.[5] Therefore, by counsel's candid admission, Plaintiffs' antitrust claim, and the other counts tethered to its survival, will withstand a Rule 12(b)(6) motion only if it can fit into the very narrow classification of a *per se* group boycott. The impetus to "plead the case as a *per se* violation" is unusual, considering the fact that "[t]oday, most concerted refusals to deal, even those involving competitors, are evaluated under a rule of reason." HOVENKAMP, *supra* at § 5.4a1. *See also Northwest Wholesale Stationers v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) ("There is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se*

---

**4.** It is axiomatic that in order for a cause of action in antitrust to exist in most circumstances, other than under a *per se* approach, the Defendant must have market power in the relevant market. *See e.g., Murrow Furniture Galleries, Inc. v. Thomasville Furniture Industries, Inc.*, 889 F.2d 524, 528 (4th Cir.1989); HOVENKAMP, *supra*, at § 3.1 ("Many antitrust violations require the plaintiff to show that the defendant has some market power.").

**5.** In the landmark decision of *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Court severely limited the availability of private plaintiffs to utilize the antitrust laws as a sword by requiring antitrust plaintiffs to prove injury to overall competition, not just injury to the plaintiff itself. The famous line emerging from that case was that "[t]he antitrust laws, however, were enacted for 'the protection of competition, not competitors.'" *Id.* at 488, 97 S.Ct. 690 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Even in the most favorable light, Plaintiffs' Complaint does not allege any facts which suggest that Defendant's behavior negatively affects competition. Plaintiffs' conclusory statement that "[a]ntitrust injury, in the form of the exclusion of Southern for specified automotive loans financed through Defendant Centrix and its associated credit unions, resulted and will continue to result in injury and harm to Southern and Maryland consumers[,]" Compl. ¶ 24, is not sufficient. This statement fails to meet even the 12(b)(6) standard because "the pleader may not evade [Rule 12(b)(6)] requirements by merely alleging a bare legal conclusion[.]" *Dickson*, 309 F.3d at 213.

doctrine.' ") (quoting L. SULLIVAN, LAW OF ANTITRUST 229–30 (1977)). Nevertheless, the Court will analyze the Complaint to determine whether, viewed in the light most favorable to the Plaintiffs, there is a cognizable *per se* antitrust claim.

Plaintiffs' allegation that Centrix has engaged in a *per se* violation of antitrust law is premised on a group boycott theory. The Supreme Court "has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Northwest Wholesale Stationers,* 472 U.S. at 290, 105 S.Ct. 2613. The question thus presented is whether Centrix's alleged agreement with one or more unidentified competitor(s) of the Plaintiffs not to enter into a dealer agreement with one or more of the Plaintiffs "should fall within this category of activity that it is conclusively presumed to be anticompetitive." *Id.*

The alleged agreement between Centrix and one or more unidentified competitor(s) of Plaintiffs is not the traditional paradigm for *per se* group boycotts. In older Supreme Court cases, *per se* condemnation was reserved for instances where competitors had an agreement with each other to refuse to deal with a third party or parties. For example, in *Fashion Originators' Guild of America v. Federal Trade Commission,* 312 U.S. 457, 312 U.S. 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941) the Supreme Court concluded that competitors in the women's garment industry had engaged in a *per se* violation by entering into an agreement with each other not to sell their products to retailers who would also sell copies of their original garments. It was the agreement between horizontal firms, acting in concert through an "extra-governmental agency," which was so offensive to both the Sherman and Clayton Acts that

condemnation was appropriate without a detailed inquiry into the market. *See id.* at 468, 61 S.Ct. 703 ("Under these circumstances it was not error to refuse to hear the evidence offered, for the reasonableness of the methods pursued by the combination to accomplish its unlawful object is no more material than would be the reasonableness of the prices fixed by unlawful combination."). A later Supreme Court case, *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), although closer to the situation currently before this Court, is sufficiently dissimilar that Plaintiffs, although they attempt to do so, cannot rely on its rationale for support.

In *Klor's,* manufacturers and distributors of well-known electronics products agreed with Broadway–Hale, a retailer that was a competitor of Klor's, that they would either not sell to Klor's or sell at discriminatory prices. *Id.* at 209, 79 S.Ct. 705. The Court found Klor's claim to "clearly show one type of trade restraint and public harm the Sherman Act forbids[.]" *Id.* at 210, 79 S.Ct. 705. Significantly, the Court also declared that "[t]his is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in this complaint is a wide combination consisting of manufacturers, distributors and a retailer." *Id.* at 212–13, 79 S.Ct. 705 (footnote omitted). There is no "wide combination" alleged in Plaintiffs' Complaint. Moreover, they have not alleged any type of horizontal agreement between Centrix and other firms offering credit options. These differences foreclose Plaintiffs' *per se* claim because, although it is not explicit in *Klor's,* the Supreme Court has later interpreted its decision in *Klor's* to restrict application of "the *per se* rule in the boycott context to cases involving horizontal

agreements among direct competitors." *NYNEX*, 525 U.S. at 135, 119 S.Ct. 493. Thus, while it is suggested in *Klor's* that the impetus for affixing a *per se* label on the agreements between Broadway–Hale and electronics manufacturers is because the agreement between manufacturers not to deal with Klor's is a *horizontal restraint, see Klor's*, 359 U.S. at 210–13, 79 S.Ct. 705, later Supreme Court cases have conclusively determined that that interpretation is no longer merely a "suggestion". *See NYNEX*, 525 U.S. at 135, 119 S.Ct. 493; *Northwest Wholesale Stationers, Inc.*, 472 U.S. at 294, 105 S.Ct. 2613 ("Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage a competitor by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." (citations omitted)). Thus, for an agreement to be deemed a *per se* group boycott, it must be made among horizontal competitors.

Plaintiffs attempt to fit this agreement into the *per se* box by alleging, upon "information and belief," that Centrix has agreements with more than one of Plaintiffs' unidentified competitors. Recognizing that *Klor's* and *NYNEX* require some horizontal agreement in order to constitute a *per se* violation, Plaintiffs vaguely attempt to implicate more than one of their competitors (horizontally related to them), in order to fall within *per se* analysis. This additional allegation, however, does not cause this agreement to fall within the ambit of *Klor's* because there is still no horizontal *agreement*. Nowhere in the Complaint do the Plaintiffs allege that their competitors have agreed amongst themselves. First, the Court notes that the majority of the Complaint alleges only that there is an agreement between Defendant and one of Plaintiffs' competitors. For example, the Complaint claims that "Defendant Centrix could not contract with Southern because *a competitor of Southern* had an agreement with upper management of Centrix not [sic] specifically setting forth that Centrix could not contract with Southern." Compl. ¶ 8 (emphasis added). This averment suggests that the Defendant had an agreement with only one of Plaintiffs' competitors, and states nothing about agreements between Defendant and more than one competitor, nor does it suggest a "wide agreement" amongst Southerns' competitors. Other averments in the Complaint discuss Defendant's alleged agreements, but omit any allegation of collusion among competitors. *See id.* ¶ 14 ("Centrix had no intention of entering into a Dealer Agreement [with Southerns] . . . due to *a relationship with a Southern competitor*." (emphasis added)). Plaintiffs, by alleging that this situation is analogous to the *per se* violation in *Klor's* clearly misunderstand the requirement that there be a horizontal restraint.

The only averment in the Complaint that suggests the involvement of more than one of Plaintiffs' competitors is in Paragraph 17, where Plaintiffs aver that "Centrix has refused to enter into any contract or establish a business relationship with Southern as a result of an illegal combination or agreement in restraint of trade between Centrix and competitors of Southern[.]" *Id.* at ¶ 17. By making this allegation and arguing that there is a *per se* violation, Plaintiffs again exhibit their misunderstanding of the horizontal agreement requirement. This averment does not cause the alleged arrangement to fall into the *per se* category because it makes no mention of any agreement, much less a wide one, *among Plaintiffs' competitors*. *See NYNEX*, 525 U.S. at 135, 119 S.Ct. 493 ("[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors . . . . Although *Klor's* involved a threat

made by a *single* powerful firm, it also involved a horizontal agreement among those threatened, namely, the appliance suppliers, to hurt a competitor of the retailer who made the threat."). Thus, because there is no allegation of horizontal agreement among Plaintiffs' competitors as there was between the electronics manufacturers in *Klor's* there is no *per se* violation.

■ Although not averred in the Complaint, the Court points out that even if Plaintiffs had alleged that competitors of Southerns had a horizontal agreement among themselves and with Centrix to force Centrix to refuse to deal with Plaintiffs this would not be sufficiently similar to the *per se* cases to survive Defendant's 12(b)(6) motion. In *Klor's* the agreement among "such well-known brands as General Electric, RCA, Admiral, Zenith, Emerson and others [to] conspire among themselves and with Broadway–Hale" *Klor's*, 359 U.S. at 209, 79 S.Ct. 705, was what led the Court to hold that there was a "wide combination" in violation of the antitrust laws. *Id.* at 212–13, 79 S.Ct. 705. The Court applied the *per se* rule to this conduct because competitors in a dominant vertical position to Klor's had agreed not to sell their products to Klor's. This is a naked boycott, and, as explained by Professor Hovenkamp, "[t]he *per se* rule is reserved for so-called *naked* boycotts-that is concerted refusals of competitors to deal with another competitor, customer or supplier when no case can be made that the refusal is ancillary to any legitimate joint activity." HOVENKAMP, *supra* at § 5.4al. In *Klor's* the electronics manufacturers agreed not to deal with a supplier/retailer. In this case, if the Court reads into the Complaint the allegation that Plaintiffs' competitors agreed among themselves and with Centrix, the situation is so different than *Klor's* that there is no "long experience with ... [this type of] practice [to conclude] that the practice produces many

pernicious results and almost no beneficial ones." *Id.* at § 6.4a. The agreement in this case is not among competitors who have a dominant vertical relationship to Plaintiffs. A viable analogy to *Klor's* could only be drawn if one of Southerns' competitors agreed with numerous financial services firms (who also agreed among themselves) not to offer financing to Southerns, or offer it at discriminatory prices. Because this type of arrangement is not alleged, even if Plaintiffs had alleged that numerous competitors of Southerns agreed among themselves and with Centrix, they have not stated a *per se* violation of the antitrust laws.

Because Plaintiffs have not stated a claim for a *per se* violation of the antitrust laws, and Plaintiffs have failed to allege various facts which would enable this Court to permit the claim to continue under a rule of reason theory, Count I, alleging violations of the Maryland Antitrust Act, will be dismissed. Leave to replead will be granted, but counsel for the Plaintiffs is reminded of the necessity of a good faith basis for factual contentions having evidentiary support sufficient to state a viable Maryland antitrust claim.

### Tortious Interference with Business Relations and Prospective Business Relations and Civil Conspiracy (Counts IV and V)

■ Both of these claims are inextricably tied to the Plaintiffs' underlying antitrust and defamation/false light invasion of privacy claims. As explained below, because Plaintiffs have failed to state an antitrust claim, and need to replead their defamation and false light invasion of privacy claims in order to meet the jurisdictional threshold, the Complaint fails to state a claim under these two counts.

■ Under Maryland law the following elements are necessary to state a claim under the tort of intentional interfer-

ence with business relations: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual damage and loss resulting." *Berlyn, Inc. v. Gazette Newspapers*, 223 F.Supp.2d 718, 741 (D.Md.2002) (citing *Alexander & Alexander v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 650 A.2d 260, 269 (1994)). "[T]he two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 485 A.2d 663, 674 (1984).

> The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation. The two types of actions differ in the limits on the right to interfere which will be recognized in either case. Thus, where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved.

*Id.* (citations omitted). In this case, the principal gravamen of the Complaint is the lack of contract between Plaintiffs and Defendant (which is not an actionable tort), but it may be possible to divine from the vague allegations of the Complaint that the Plaintiffs are alleging interference with relationships between them and their customers. Even assuming that the Court is willing to read the tortious interference count as alleging that Defendant inter-

fered with Plaintiffs' relationship with potential customers, Plaintiffs have a heavy burden because when there is no contract between the parties, as in this case, "it is necessary to prove both a tortious intent and improper or wrongful conduct." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 639 A.2d 112, 119 (1994).

██ Plaintiffs have not sufficiently alleged facts that would satisfy the third element of the version of this tort applicable to situations where there is no binding contract. *See Berlyn*, 223 F.Supp.2d at 741. ("The tort requires conduct that is independently wrongful or unlawful[.]"). "Wrongful or unlawful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Macklin*, 334 Md. at 300, 639 A.2d 112 (citing *K & K Management v. Lee*, 316 Md. 137, 557 A.2d 965, 973–81 (1989)).

In their Complaint, Plaintiffs allege that (1) the agreement by Centrix not to deal with them (the antitrust claim) and (2) the statement by Centrix that Plaintiffs were a "fraud and being investigated for fraud crimes with banks and customers" (the defamation and false light invasion of privacy claims) were the "wrongful acts" which formed the basis for this tort. Compl. ¶ 38–41. Plaintiffs have not stated a claim for an antitrust violation, and thus this cannot be the wrongful act. With regard to the defamation and false light invasion of privacy claims, they are questionable as to the level of damages required for federal jurisdiction, and repleading is required if they are to survive. There was nothing in the Complaint which suggested that the Defendant's alleged statement to one of Plaintiffs' competitors was calculated to cause damage to the Plaintiffs (the second factor of this tort).

Similarly, no facts suggest that the Defendant's statement to one or more of the Plaintiffs' competitors, forming the basis of the defamation claim, was done with the unlawful purpose to cause damages and loss to the Plaintiffs in their business relations (the third factor of this tort).[6] Therefore, Plaintiffs have failed to state a claim for Tortious Interference with Business Relations and Prospective Business Relations. As a result, Count IV will be dismissed.

 Similarly, because the Plaintiffs have not stated a claim for restraint of trade, they have also failed to state a claim for a civil conspiracy whose object is to restrain trade. As recently summarized by this Court, "[a] civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or means employed must result in damages to the plaintiff." *BEP, Inc. v. Atkinson*, 174 F.Supp.2d 400, 408 (D.Md.2001) (citing *Green v. Washington Sub. San. Commission*, 259 Md. 206, 269 A.2d 815, 824 (1970)). *BEP* also explains that the unlawful act required to set forth a cause of action for civil conspiracy "is not necessarily a criminal act ... [but][t]here must be a violation of a legal right committed knowingly[.]" *Id.* (citing *Columbia Real Estate Title Insurance Co. v. Caruso*, 384 A.2d 468, 472–73 (Md.App.1978)). No violation of a legal right has been stated, and thus no civil conspiracy can exist. Therefore, Count V will be dismissed.

### Unfair Competition (Count II)

 Unlike the Plaintiffs' Tortious Interference and Civil Conspiracy claims, it is not, at first, clear that Plaintiffs' Unfair Competition claim should fall as a result of the dismissal of the antitrust claim. The dismissal of this claim does not automatically follow from the dismissal of the antitrust, defamation and false light invasion of privacy claims because this Court has consistently delineated the parameters of this tort in a very broad manner. For example, this Court has explained that "[w]hat constitutes unfair competition in a given case is governed by its own particular facts and circumstances." *Sun Dun. Inc. of Washington v. Coca–Cola Co.*, 740 F.Supp. 381, 397 (D.Md.1990) (citing *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 34 A.2d 338, 342 (1943)). In a similar vein, the Court of Appeals of Maryland has enunciated the broad principle, with regard to the tort of unfair competition, that "[e]ach case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Baltimore Bedding Corp.*, 34 A.2d at 342. This same case, however, offered examples of what types of activities constitute unfair competition. The Court held that "no one ... is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Id.*

In the Complaint, Plaintiffs restrict their unfair competition claim to the allegation that Centrix has unlawfully excluded and restrained Plaintiffs in the market of financing automotive loans. *See* Compl.

---

**6.** Plaintiffs bald assertion that Defendant made the defamatory statement with "the intent to cause economic harm and injury to Southern's business" is not sufficient to withstand scrutiny under 12(b)(6). As previously stated, the Court need not accept legal conclusions couched as factual allegations. *Papasan*, 478 U.S. at 286, 106 S.Ct. 2932. Plaintiffs offer no facts to indicate how they arrived at the conclusion that Defendant's statement was intended to, or did, cause economic injury to the Plaintiffs.

¶ 28–30. Plaintiffs allege that the Defendant's fraudulent or unfair methods were its decisions not to deal with them, *i.e.* the alleged antitrust violation. Therefore, just as the Plaintiffs' Tortious Interference and Civil Conspiracy claims cannot withstand the 12(b)(6) standard because they are tethered to the antitrust claim, the unfair competition claim must also be dismissed. *See Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.*, 53 Md.App. 379, 454 A.2d 367, 374 (Md.App.1983) ("Since [plaintiff] failed to present evidence establishing a connection between [defendant] and a violation of the antitrust laws, under the facts of this case [defendant's] conduct could not constitute unfair competition."). Because Plaintiffs have not alleged any behavior, other than Defendant's rejected refusal to deal theory, that would be considered to be a traditional common law unfair competition cause of action, *see* RESTATEMENT (THIRD) OF UNFAIR COMPETITION FOREWORD ("Included within this Restatement are causes of action for passing off, deceptive advertising, and the infringement of trademarks, trade secrets, and publicity rights."); PAUL GOLDSTEIN, COPYRIGHT, PATENT, TRADEMARK AND RELATED STATE DOCTRINES 58 (5th ed.2002), the court finds this case analogous to *Cavalier.* Moreover, the Court notes that it is unusual for an antitrust violation to give rise to a cause of action for unfair competition because "while antitrust law prohibits 'not enough' competition, unfair competition law forbids 'too much' competition." McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 1:23 (4th ed.2004). "Each set of prohibitions-antitrust and unfair competition-approach the competitive spectrum at opposite ends[,]" *id.,* so Plaintiffs are unlikely to succeed on an unfair competition claim which argues that the Defendant's anticompetitive refusal to deal (restricting competition) gave rise to the tort of unfair competition (ensuring that companies are not over-competitive). For these reasons, Count II will be dismissed.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion to Dismiss will, by a separate order, be GRANTED with thirty days leave to file an Amended Complaint conforming to the requirements of this opinion.

## *ORDER*

Upon consideration of Defendant's Motion to Dismiss [Paper No. 8], the opposition thereto, the arguments of counsel for the parties at a hearing held before the undersigned on October 25, 2004, and for the reasons stated in the accompanying Memorandum Opinion, it is, this 15th day of February, 2005, by the United States District Court for the District of Maryland,

ORDERED, that Defendant's Motion to Dismiss [Paper No. 8] is GRANTED; and it is further

ORDERED, that Plaintiffs are granted thirty (30) days to file an Amended Complaint in conformity with the accompanying Memorandum Opinion.